IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TITLEMAX OF ALABAMA, INC., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:20-CV-416-WKW |
| | ) | [WO] |
| LEVIA WOMACK, | ) | |
| | ) | |
| Appellee. | ) | |

**MEMORANDUM OPINION AND ORDER**

On March 1, 2019, Levia Womack (hereinafter "Debtor") pawned her 2014 Ford Fusion to TitleMax of Alabama, Inc. ("TitleMax"). Eleven days before the pawn contract matured, Debtor filed a petition for Chapter 13 bankruptcy in the Middle District of Alabama. (Doc. # 3-3.) The petition included Debtor's proposed plan to repay TitleMax over the 49-month life of the plan. (Doc. # 3-4.) In June 2020, the United States Bankruptcy Court for the Middle District of Alabama denied TitleMax's objection to confirmation (Doc. # 3-32) and confirmed Debtor's Chapter 13 plan (Doc. # 3-31). TitleMax appeals these two decisions, which were explained in an accompanying memorandum opinion. (Doc. # 3-24.) For the reasons that follow, the Bankruptcy Court's decisions (collectively, the "Orders") are due to be affirmed.

## I.  JURISDICTION AND VENUE

The court has jurisdiction to hear appeals from final orders of the Bankruptcy Court.  28 U.S.C. § 158(a)(1).  The Bankruptcy Court's orders confirming Debtor's Chapter 13 plan and overruling TitleMax's objection to confirmation both constitute final orders.  *See, e.g.*, *In re Tennyson*, 611 F.3d 873, 875 (11th Cir. 2010).  Venue is proper because an appeal "shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving."  28 U.S.C. § 158(a).

## II. STANDARD OF REVIEW

"The district court in a bankruptcy appeal functions as an appellate court in reviewing the bankruptcy court's decision."  *In re Williams*, 216 F.3d 1295, 1296 (11th Cir. 2000).  The court reviews the bankruptcy court's findings of fact under the clearly erroneous standard and its conclusions of law under the *de novo* standard of review.  *In re Piazza*, 719 F.3d 1253, 1260 (11th Cir. 2013) (citation omitted).  "The court may affirm the bankruptcy court's judgment 'on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below.'"  *Perry v. United States*, 500 B.R. 796, 798 (M.D. Ala. 2013) (Watkins, J.) (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)).

In the instant case, TitleMax appeals only legal determinations, which are subject to *de novo* review. (*See* Doc. # 5, at 10 (noting that "[t]here are no disputed factual issues").)

### III.  BACKGROUND

Debtor Levia Womack pawned her 2014 Ford Fusion on March 1, 2019. Pursuant to a valid pawn contract, Debtor pledged title to her Fusion in exchange for a loan in the amount of $3,792.40. (Doc. # 8-4.) If Debtor failed to repay the loan by March 31 (the "Maturity Date"), her account entered default, at which time TitleMax could lawfully take possession of the Fusion. (Doc. # 8-4, at 2:1, 2:7.)

Prior to the loan's Maturity Date, Debtor filed a petition for Chapter 13 bankruptcy in the Middle District of Alabama. (Doc. # 3-3.) The proposed plan called for Debtor to repay TitleMax over the life of the plan. (Doc. # 3-4.) TitleMax objected, arguing that Debtor's ability to redeem the vehicle had expired with the passage of time, causing Debtor to forfeit the vehicle to TitleMax—and, in turn, causing the Fusion to fall out of the bankruptcy estate. (Doc. # 3-5.)

On June 9, 2020, the United States Bankruptcy Court for the Middle District of Alabama issued an opinion that rejected TitleMax's contentions. (Doc. # 3-24.) The Bankruptcy Court also overruled TitleMax's objections (Doc. # 3-11) and confirmed Debtor's Chapter 13 plan (Doc. # 3-13). TitleMax timely appealed. (Doc. # 1.)

## IV.  DISCUSSION

Chapter 13 of the Bankruptcy Code "enables a debtor with a regular income to repay all or part of his debts, typically over a three- to five-year period." *In re Cumbess*, 960 F.3d 1325, 1330 (11th Cir. 2020); *see generally* 11 U.S.C. § 1301, *et seq*.  Bankruptcy's basic mechanism relies on the creation of a bankruptcy estate that includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).  A Chapter 13 plan can then "modify the rights of holders of secured claims" on property in the estate, with a few exceptions, ensuring repayment over time.  *Id.* at § 1322(b)(2).  Put simply, "a debtor who proceeds under Chapter 13 may keep his prepetition property but must repay his creditors over time, generally from what he earns after filing bankruptcy." *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1179 (11th Cir. 2017).

In keeping with this basic process, Debtor, over TitleMax's objection, sought to modify TitleMax's claim to her Ford Fusion.  On appeal, TitleMax argues that, though Debtor's interests in the Fusion *entered* the estate, "[t]he vehicle ceased to be property of the estate" after a statutory redemption period lapsed.  (Doc. # 5, at 45.)  TitleMax therefore argues that it owns the Ford Fusion and that Debtor is unable to modify its claims.  (Doc. # 5, at 45.)  Accordingly, the instant appeal centers on the contents of the bankruptcy estate:  What interests in the Fusion entered the bankruptcy estate, and what interests remained over time?

4

The bankruptcy estate is a simultaneous product of federal and state law. "It is clear that [w]hether an interest of the debtors is property of the estate is a federal question. Nevertheless, the nature and existence of the debtors' right to property is determined by looking at state law." *In re Thomas*, 883 F.2d 991, 995 (11th Cir. 1989) (internal quotation marks and citations omitted); *see also In re Kalter*, 292 F.3d 1350, 1353 (11th Cir. 2002); *In re Smith*, 85 F.3d 1555, 1557 (11th Cir. 1996). In other words, a property interest is "created and defined by state law," *Butner v. United States*, 440 U.S. 48, 55 (1979); federal bankruptcy law then determines the status of that interest with respect to the bankruptcy estate. *See, e.g.*, *In re Northington*, 876 F.3d 1302, 1311 (11th Cir. 2017) ("[A]nalyzing a bankruptcy estate requires two tiers of inquiry, first into the assets of the estate, and then into the underlying property rights and interests that constitute each asset—first, that is, into the estate's contents, and then into the contents of the contents."); *In re Jones*, 544 B.R. 692, 700 (Bankr. M.D. Ala. 2016) ("[T]he extent to which a Chapter 13 debtor may modify the rights of a secured creditor or cram down its collateral depends on the nature of the debtor's rights that become property of the estate."). Here, then, the threshold inquiry concerns the nature of Debtor and TitleMax's interests in the Ford Fusion under state law. Once those interests are identified, federal law takes over.

A. **Interests in the Ford Fusion at Time of Debtor's Petition**

Under Alabama law, title loans are treated as pawn transactions and are governed by the Alabama Pawnshop Act ("APA"), Ala. Code (1975) § 5-19A-1, *et seq*. *See, e.g.*, *Complete Cash Holdings, LLC v. Fryer*, 297 So. 3d 1223, 1225 (Ala. Civ. App.), *reh'g denied* (Oct. 4, 2019), *cert. denied* (Dec. 13, 2019); *see also In re Jones*, 544 B.R. at 697 ("[A] certificate of title to an automobile qualifies as 'pledged goods' such that its offer as security is sufficient to create a transaction subject to the Alabama Pawnshop Act, even when the pledgor retains possession of the vehicle."). The APA thus governs the agreement at issue here, as TitleMax acknowledged in its brief. (Doc. # 5, at 13 ("[T]he agreement at issue is . . . governed by the Alabama Pawnshop Act.").)

Debtor entered into a pawnshop agreement with TitleMax on March 1, 2019. (Doc. # 8-4.)[1] Pursuant to the pawn agreement, Debtor "promise[d] to pay lender . . . due and payable on 03/31/2019 (the "Maturity Date")." (Doc. # 8-4, at 2:1.) TitleMax received a "security interest" in the vehicle and title, recorded by a lien on the title. (Doc. # 8-4, at 2:1.)

After the Maturity Date, a missed payment would place Debtor's account in default, at which point TitleMax could "take possession of the vehicle." (Doc. # 8-

---

[1] The validity of the pawn transaction itself is undisputed. (*See, e.g.*, Doc. # 5, at 13 ("[T]here is no dispute that the agreement at issue is a valid pawn agreement . . . .").)

6

4, at 2:7.) Then, thirty days *after* the Maturity Date—by operation of the agreement and Alabama law—the unredeemed vehicle would be forfeited, along with absolute right, title, and interest, to TitleMax. (Doc. # 8, at 2:5.) *See also* Ala. Code (1975) § 5-19A-6 ("Pledged goods not redeemed within 30 days following the originally fixed maturity date shall be forfeited to the pawnbroker and absolute right, title, and interest in and to the goods shall vest in the pawnbroker."). This thirty-day window is commonly referred to as a "grace period" during which the pledgor may redeem the item despite being formally in default. During these thirty days, TitleMax could have possessed, but not sold, the vehicle; Debtor would have retained a right to redeem the Fusion and a conditional possessory interest. (Doc. # 8, at 2:7.) *See also* Ala. Code (1975) at § 5-19A-10 (allowing for redemption or repurchase by the pledgor for 30 days after the maturity date).[2]

Because the Maturity Date had not yet passed, TitleMax held a title lien on the Ford Fusion. *See id.* ("A pawnbroker shall have a lien on the pledged goods pawned for the money advanced and the pawnshop charge owed . . . ."). TitleMax itself concedes that, on the petition date, it "had a pawnshop lien pursuant to [the APA]." (Doc. # 9, at 11.) Further, and again pursuant to the explicit terms of the pawn agreement, TitleMax also received a "security interest" in the pawned vehicle.

---

[2] The Maturity Date had not passed when Debtor filed her Petition. But, as is described below, the changes that would have occurred *at* the Maturity Date help to clarify the nature of Debtor's property interest in the Fusion *before* the Maturity Date, when the Petition was filed.

(Doc. # 8-4, at 2:1.)  That is, TitleMax held "an interest in personal property or fixtures which secures payment or performance of an obligation."  Ala. Code (1975) § 7-1-201.  Prior to the contract's Maturity Date (*i.e.*, absent Debtor's default), therefore, TitleMax held both a title lien and a security interest in the Ford Fusion. *See, e.g.*, *In re Jones*, 544 B.R. at 698 ("[A] pawn transaction may also qualify as a security agreement, and a pawnbroker may obtain both a pawnshop lien and a UCC security interest on the same pledged goods, or collateral, from the same transaction.").

In contrast, because the Maturity Date had not yet passed, Debtor remained the vehicle's owner when she filed her petition—a fact that TitleMax readily concedes.  "TitleMax admits that on the petition date, *the Debtor was the owner of the vehicle*, and that TitleMax had a pawnshop lien . . . ."  (Doc. # 9, at 11 (emphasis added); *see also* Doc. # 5, at 24 n.6.)  Alabama law supports TitleMax's admission. *Cf. In re Jones*, 544 B.R. at 700 (noting that, "[i]n Alabama, a debtor retains legal title to personal property securing a creditor's interest up to the point of default, but upon default the debtor's legal title passes to the secured creditor" (citing *In re Lewis*, 137 F.3d 1280, 1283–84 (11th Cir. 1998)).  Under Alabama law and by TitleMax's own acknowledgment, therefore, Debtor owned the Fusion when she filed her bankruptcy petition.  Her ownership interest in the vehicle entered the bankruptcy estate, along with her right to redeem it.  *See, e.g.*, *In re Lewis*, 137 F.3d at 1284

(noting that a party's interests in a pawned automobile became "property of the estate . . . at the commencement of the case").

## B. Treatment of Interests by the Bankruptcy Code

TitleMax argues that the Ford Fusion, and any of Debtor's claims to it, ceased to be property of the estate after a statutory redemption period expired. (Doc. # 5, at 7.) Debtor disagrees (Doc. # 8, at 21), as did the Bankruptcy Court (Doc. # 3-24, at 11). Beneath the parties' divergent views is the complex interplay between the APA and the Bankruptcy Code.

Various provisions of the Bankruptcy Code might apply to interests in a pawned vehicle that have entered a bankruptcy estate. *See generally In re Northington*, 876 F.3d at 1306. In general, the Bankruptcy Code defines a bankruptcy estate as including "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), which is the date that the debtor's petition is filed. *See, e.g.*, *In re Northington*, 876 F.3d at 1309 ("As used in Section 541(a)(1), the term 'commencement' means the date on which the debtor filed his bankruptcy petition."). More particularly, a Chapter 13 plan can "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence . . . ." 11 U.S.C. § 1322(b)(5). At first blush, the parties' competing interests in the Ford Fusion appear to be governed by this section: at the commencement of the case,

9

Debtor held legal title (in addition to a right to possess), while TitleMax retained a "security interest" in the vehicle.

TitleMax argues that a distinct provision of the Bankruptcy Code applies. As the Eleventh Circuit recently noted, the entire bankruptcy estate does not necessarily freeze when the petition is filed. Instead, it "can, in certain circumstances, expand or contract in accordance with the operation of underlying state-law property rules." *In re Northington*, 876 F.3d at 1314. One such circumstance is governed by 11 U.S.C. § 108, which provides that:

> (b) Except as provided in subsection (a) of this section, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor or an individual protected under section 1201 or 1301 of this title may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of—
>
>> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
>>
>> (2) 60 days after the order for relief.

11 U.S.C. § 108(b). Thus, statutory periods governed by § 108(b) (for, *e.g.*, the curing of a default) are extended for a limited period of time. After the extended period expires, the underlying asset is at risk of falling out of the bankruptcy estate, including by the mere passage of time, if the estate no longer retains a property interest in it. *See generally In re Northington*, 876 F.3d at 1313–15.

These two provisions clearly counsel different paths for the estate at issue here.  If the estate's property interests in the Fusion fell within the purview of § 108(b), then they would have remained in the estate for only the statutorily limited period of 60 days.  *See id.* (describing the impact of § 108(b) on a pawned vehicle that was not redeemed and that therefore fell out of the bankruptcy estate).  They therefore could not have been subsequently modified by Debtor's Chapter 13 plan.  *See id.*; *see generally In re Jones*, 544 B.R. at 701 (noting that "the debtor cannot modify the rights of the secured creditor under § 1322(b)(2) if the debtor has lost legal title to the collateral and the secured creditor objects to such treatment").  On the other hand, if Debtor's ownership interest stayed in the estate, then TitleMax's corresponding interests remained modifiable under the more general provisions of § 1322(b).

The Eleventh Circuit recently clarified the reach of § 108(b) in *Northington*, a case on which TitleMax relies.  In *Northington*, a debtor (Mr. Wilber) pawned his Charger and went into default.  *See In re Northington*, 876 F.3d at 1306.  The debtor thus found himself in a "grace period" comparable to that provided by Alabama law.  *See id.*  During that grace period (and after the relevant maturity date), he filed a Chapter 13 petition.  *See id.*

The *Northington* court concluded that § 108(b) governed Wilber's rights in the Charger once those rights entered the estate.  It noted that, "following his loan's

11

maturity date, [the debtor] had a conditional right to possess the Charger as well as a right to redeem it during the statutory period." *Id.* at 1315. Those two rights—the conditional right to possess and the right to redeem—became property of the estate, and they were extended beyond the initial 30-day grace period by § 108(b). *Id.* "But after the expiration of the prescribed period, Wilber had no rights in the car, possessory or otherwise." *Id.*

Importantly, the Eleventh Circuit concluded that the inquiry hinged upon the nature of the "estate's constituent property interests": "If an asset is by its state-law nature static, then it remains so in the bankruptcy estate. If, by contrast—as is often the case—state law imbues an estate asset with a sort of internal dynamism, then that characteristic will follow the asset into the estate." *Id.* at 1314. And the interests initially retained by Wilber's bankruptcy estate—a "conditional right to possess" and a "right to redeem," *id.*—were indeed dynamic: both could be converted to a more substantial and permanent right, *ownership*, only by the affirmative act of redemption. *Cf. In re Bramlett*, 483 B.R. 244, 246 (Bankr. N.D. Ala. 2012) (noting that "a debtor must take 'affirmative steps' in the Eleventh Circuit to exercise the right of redemption"). Unlike those interests, legal title had passed to the creditor before the commencement of the bankruptcy case. *See generally In re Jones*, 544 B.R. at 700 (noting that "upon default the debtor's legal title passes to the secured creditor" (citing *Lewis*, 137 F.3d at 1283–84)).

The Eleventh Circuit provided an additional example of an interest imbued with such "internal dynamism": an option contract. "If the debtor fails to exercise the option in accordance with state law, then the right to buy disappears." *In re Northington*, 876 F.3d at 1315. Thus, without action by a debtor within the relevant period (as extended by § 108(b)), any right to consummate that option contract would expire, and the option contract would fall out of the estate. *See id*. *Northington* thus provides two guideposts for the types of dynamic assets that can, with the passage of time, fall out of the bankruptcy estate: an option contract and a conditional right to possess and redeem.

In the instant case, however, the estate's "constituent property interest[]," *In re Northington*, 876 F.3d at 1314, is distinct, and thus it demands a different result. Debtor Womack, unlike her counterpart in *Northington*, retained more than a conditional right to possess and a right to redeem at the time she filed her Petition. As TitleMax concedes, "on the petition date, the Debtor was the owner of the vehicle," not its mere possessor. (Doc. # 9, at 11.) This difference is critical: Debtor's ownership interest lacked the dynamism that would cause it to leave the estate over time.

Nonetheless, TitleMax argues that *Northington* extends to cases, like the instant appeal, in which a petition is filed *before* a pawn agreement's maturity date. (*See, e.g.*, Doc. # 5, at 20 (arguing that *Northington* is not limited to "situations where

13

the pawn had matured prior to the date of the bankruptcy petition").) But this approach would wrongly render the date of default irrelevant with respect to the bankruptcy estate—and therefore would fail to recognize that the parties' property interests change when that date passes.[3] In truth, a debtor's interests in a pawned vehicle, and the corresponding interests of the creditor, transform when that debtor defaults.[4] Under Alabama law, after a pawn agreement has matured and a debtor defaults, the debtor retains "a conditional right to possess" and a "right to redeem" her vehicle. *Cf. In re Northington*, 876 F.3d at 1315 (describing comparable phenomenon under Georgia's pawn law). But before the maturity date, as TitleMax conceded in the instant case, the debtor remains the vehicle's owner. (Doc. # 9, at 11 (admitting that, "on the petition date, the Debtor was the owner of the vehicle").)

---

[3] TitleMax argues that "[t]here is no basis in Alabama (or Eleventh Circuit) law for distinguishing pre- and post-maturity positions in the bankruptcy context." (Doc. # 9, at 10.) As noted above, this position ignores the changes in property interests that occur on the maturity date of a pawn agreement. Moreover, beyond disregarding the shift in the underlying property interests, TitleMax's arguments risk rendering a contractual provision superfluous—namely, the provision indicating that the account will be in default if payment is not timely made. (Doc. # 8-4, at 2:7.) But "[a] cardinal rule of contractual construction is that, '[s]ince an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous.'" *Reynolds v. Ala. Dep't of Transp.,* 955 F. Supp. 1441, 1447 (M.D. Ala. 1997) (Thompson, J.) (citation omitted).

[4] As noted above, the date of default plays a significant role in the creditor-debtor relationship under Alabama law. *Cf. In re Jones*, 544 B.R. at 700 (noting that title passes to a secured creditor "upon default"). The Eleventh Circuit, reviewing Alabama law, has also noted the importance of the date of default in the "closely-related law of conversion." *In re Lewis*, 137 F.3d at 1283 ("The court of civil appeals . . . has stressed that '[u]pon a debtor's default, title and right of possession pass to the creditor.'" (citation omitted)). In contrast, TitleMax's arguments wrongly suggest that the date of default merely triggers the relevant "grace period"—and, by extension, that no change in the debtor-creditor relationship occurs at the date of default itself.

Debtor's ownership of the Fusion therefore entered the estate. Once it did, it could not be reduced, by the mere passage of time, into the conditional and time-limited rights of the sort described in *Northington*. It is thus not subject to expiration under § 108(b).

When she filed her petition, then, Debtor owned her Ford Fusion and her right to redeem, both of which entered and remained in the bankruptcy estate. TitleMax held a secured claim. Accordingly, TitleMax's claims must be governed by § 1322(b)(2), which allows a Chapter 13 plan to "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence . . . ." Debtor's Chapter 13 plan utilized this statutory power and modified TitleMax's claim. The Bankruptcy Court properly confirmed it.

## V. CONCLUSION

The Bankruptcy Court correctly characterized Debtor's interests in the Fusion, which passed into the estate at the filing of her petition, and the inapplicability of § 108(b) to their resolution. Because the entirety of TitleMax's appeal hinges on these questions, the appeal does not avail.

Having conducted a *de novo* review of the bankruptcy court's legal conclusions, the court finds that the Bankruptcy Court's Orders confirming Debtor's Chapter 13 plan (Doc. # 3-31) and overruling TitleMax's objection to confirmation

(Doc. # 3-32) were correct. Therefore, it is ORDERED that the decisions of the bankruptcy court are AFFIRMED.

An appropriate judgment will be entered.

DONE this 9th day of April, 2021.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE
